We'll hear argument next in Case 11-88, Mohamad v. the Palestinian Authority. Mr. Fischer. Mr. Chief Justice, and may it please the Court, unlike the previous case, this case does not involve the need to formulate Federal common law or to survey customary international law. Here Congress has expressly created the cause of action at issue in a statute. And we know that in every single other Federal tort statute that Congress has ever enacted, it is provided for organizational liability. As Justice Kennedy, I think you put it earlier, it's a simple concept in our country. But of course the question We usually like to begin with the language of the statute. That was my next sentence. Well, then go ahead. Thank you. But of course the question arises in this case, why did Congress use the word individual? And we think the answer comes from the Telleran case, which is the case, of course, from the D.C. Circuit that gave rise to the TVPA. And in that case, Judge Edwards wrote a lengthy concurrence where he again and again used the word individual liability, an individual, to describe the PLO, which was the very defendant in that case, against the backdrop of international law, which uses the term individual to differentiate anyone from the State. After Nuremberg, starting with the discussions recited most prominently in our reply brief at pages 6 to 8, Professor Jessup and many others discussed whether international law applies simply against States or whether it applies to, quote, individuals. And the word individual was used again and again to mean anyone but the State. And as Professor Jessup and many others said, it includes organizations and juridical persons. And this is the usage that Judge Edwards used in his opinion in Telleran. He uses the word individual 43 times in that opinion. And if you look at nothing else Justice Sotomayor, I thought Judge Edwards' opinion was about politically motivated terrorists not coming within the alien tort statute. No. What Judge Edwards concluded, Justice Ginsburg, was that as he understood the alien tort statute at the time against the backdrop of international law, that any private actor acting under color of law could be held liable. And what Judge Edwards decided in that particular case is that the PLO as it then existed was not a State actor. But the rule that Judge Edwards prescribed, and this is at page 793, I believe, of his concurrence, was that individuals acting under color of law should be held liable. That's the precise language that the TVPA uses. So if you want to know where Congress got the word individual and what it probably thought it meant, the best place to look is Judge Edwards' opinion. Scalia, Congress got it from Judge Edwards? Gee, my goodness. Well, I think, Justice Scalia, I think this Court I'll bet you none of them, none of them even read that opinion. Well, I think Judge Edwards' opinion was quite prominently read by the Congressman. It's cited throughout the legislative history in the Senate report, in the House report, again and again in the hearings. And this Court, I think in Skilling a couple terms ago, this Court said we have a statute before us dealing with honest services. And what did Congress mean when it used particular language? Well, it probably meant what lower court judges had used that language to mean, that it was honest services. That is a strange phrase, honest services, as a, you know, as a crime deprivation of honest services. But the word individual is not a strange word at all. It's used all the time. No, Justice Scalia. It means an individual. I think it's a strange phrase. It's a very strange phrase in the context of a tort statute, because we know that it's an organizational liability, and it's never used, to our knowledge, the word individual in the tort statute. So it is odd that it appears here. Is that better for you or worse for you? Well, I think it's better for us in that it shows that Congress, something is amiss. And I think Judge Edwards' opinion explains what is going on. Now, what my opponents want this Court to do is to look at other places in the U.S. Code where the word individual is used outside of international law, outside of tort regimes, and we concede often the word individual. The problem is I don't even look there. I look to the TVA, section 2A2, which uses the word person. So it wasn't as if in writing the statute Congress forgot the word person. No, it didn't. They appeared to be using person in the organizational way that person is defined in the Dictionary Act and elsewhere. So isn't that a textual clue that they were using the word individual in a different sense? No, Justice Sotomayor, for two reasons. One is because, for reasons I'll explain, the word person, as it appears in the TVPA, actually only applies to natural persons. Let me start with that. The argument the other side has is that the word person is used in the Dictionary Act. Sotomayor, I'm not quite sure. A legal representative is often, can be a person, but can often also be a corporate entity. Well, I think the argument is that the word person somehow contrasts with individual. Yes. And as we've shown in our brief, only natural people can bring wrongful death actions. They claim, and the D.C. Circuit argued that an estate could. But as we've shown in our brief, and this Court has squarely held, only natural people acting as administrator or executor of an estate can bring an action. So the word person refers to natural person. It's obvious that individual doesn't usually mean what you want it to mean. Now, you have a theory that they all just read Judge Edwards and they came in and used individual, but it seems actually as though we know where individual came from in the statute. The statute started out by saying person, and then there was this moment where one congressman said, I don't want this to apply to corporations, and the staff members said, I have a great idea to make sure it doesn't apply to corporations, let's change the word person to individual. So that's the way individual got into the statute, and it got in specifically to address this question. We don't disagree with that's how the word gets into the statute, but the question as this Court has always looked to legislative history is, what does that – what light does that shed on Congress's understanding of the law to ultimately pass? So two Congresses later, four years later, Congress passed a statute with the word individual. And the problem with that theory, Justice Kagan, is it squarely is contradicted by the committee reports contemporaneous with the statute that say we're using the word individual to make crystal clear that foreign States and their entities cannot be sued. And that's the reason I'm interested in this case. Breyer. But I looked at it because I looked at it, I did really, I know I have to go through legislative history. I've said I did meaningful, and so I do it. And so far, so far, I think I have to say that you're on a weak wicket. The word persons, when it was there, I found lots and lots of instances, and by people in the civil international civil rights community who are testifying, where I look at what they say, and over and over they say, a limited statute, the person won't often be in the United States. Well, the PLO had a presence in the United States. The person won't be in the United States very often. I know, but sometimes he may come over here. It's important to take a symbolic step, and not a word could I find when they're talking even about the word person that suggested they meant even the PLO at that time. In fact, they thought, well, it would be a nice thing, but, but, but, but. I mean, that's the tenor of what I seem to have found so far. So I mention that because you will point out to me the things that I've accidentally skipped. Fisherman, yes, pages 46 through 49 of our blue brief, Justice Breyer. There are numerous references to the word organization, group, it is a word used. And I think, Justice Kagan, this is also responsive to your question. Two years after the change you described was made, there was a hearing held before the Senate Judiciary Committee where both bills were being considered. The one bill from the House that used the word individual and the word, and the Senate bill which used the word person. And one would expect that if people thought the word individual meant something different and limited the class of defendants, that that would have come up or somebody would have expressed some awareness of it. Suppose I'm a member of the House or of the Senate, and I'm not a member of the committee that engages in all of this legislative history, and I see the word individual in the statute. And that's the basis on which I vote for or against the statute. Why should I be saddled with whatever sayings by members of the committee or by experts testifying before the committee occurred? It was out of my hearing. I voted for individual. And individual? If Congress wanted individual to mean what you say it doesn't mean, what word would they have used instead? I mean, if individual is a code word for person, what's the code word for individual? Fisherman, natural person, Justice Scalia. And we've cited many statutes in our blue brief that use the word natural person in the U.S. Code. And this goes to the question, I think it's also responsive to Justice Sotomayor, why did they use the word individual instead of person? Why did they say in the committee reports that the word individual made it crystal clear that States and their entities could not be sued? And the reason why is because person would have left some residual ambiguity as to whether something like a foreign city or a foreign county. Think of a foreign county jail that tortured somebody. Under Section 1983 law, which uses the word person, counties and cities are liable. However, under the Foreign Sovereign Immunities Act and under established international law sovereign immunities principles, they're not. So the word individual. Roberts, they chose that word to avoid any residual ambiguity, but they thought there was no ambiguity at all as to whether the term individual meant natural persons or organizational entities? Well, I respectfully submit they didn't think about that question, which is why I'm standing here today. What they were really concerned with was avoiding sweeping in foreign States and their entities. And they just didn't think. But there were witnesses who testified, were there not, Mr. Fisher, that the TVPA would take care of a philatelical-type case, that when the torturer shows up physically — those were the words they used — the torturer comes into the State, into the United States, is physically present in the United States. That was the model that at least those witnesses had in mind, and some of them were quite distinguished witnesses. There are statements to that effect, and of course, the TVPA does cover natural persons if they happen to be in the United States. But the comment that Justice Kagan pointed out is the only comment that the other side can find anywhere in the legislative history. But let's suppose that's true, Mr. Fisher. Let's suppose that aside from Congressman Leach, nobody thought about this question. But we know what the normal meaning of individual is, and you're suggesting — let's suppose they just — the question of individual versus corporate liability was not on their mind. But they chose a word that means something, and you're suggesting that we should resort to background norms that, you know, what Congress generally does, what it imposes liability, rather than the words in the statute that they passed. And why should we do that? Fisher, Well, if the word individual could only mean natural person, I agree, the case would be over. But we've cited many dictionary definitions, many usages in the U.S. Code, many holdings from this Court and others that have actually found that a secondary meaning of the  Single, unique, or unique. Ginsburg. But you found no tort statute uses individual to include organization. Fisher. Right. No tort statute uses it one way or the other, Justice Ginsburg, which we think, if anything, gets you back to the background norms and the secondary meaning. And let me say two things about the other one. Roberts I have the additional problem, though, that your reading gives a different meaning to individual in two sentences that are right. Actually, it's in the same sentence. An individual who does the torturing subjects an individual to torture. Now, I understand your argument that you can have an organization doing the subject thing, but how do you subject an organization to torture? Fisher. You don't. Roberts You don't. So individual in the one clause, you say means organization. Individual in the other necessarily does not. Fisher I don't think it's that they have different meanings, but you're certainly correct that they refer to different things. But that's no different than numerous other statutes that we cite at page 28 and 29 of our brief that use the word person to mean a plaintiff when it can be just be a natural person and a defendant when it can be an entity.  Sotomayor In the same sentence? Fisher Yes, yes. Sotomayor In those statutes you speak of? Fisher Yes, that's at page 28, 29 of the blue brief. And indeed, their whole argument, and, Justice Kagan, this goes back to your point, their whole argument is when the word person was used throughout the statute, then it changed meanings in the same way, that it covered organizational entities. So if the word person can do the same work, the word individual can do the same work. So the question is why — I think the question that you end up with is, given that individual does have this secondary meaning, does have this customary usage that Congress may well have been aware of, at least that this Court often says that if there's a customary usage of a term, we'll assume Congress was aware of it, why would Congress have done what it did and limit this act, unlike any other Federal tort statute in the U.S. Code, to natural persons? And we submit there is no good reason. Justice Ginsburg, you talked about statements in the legislative history to the effect that individual people who are torturers may be found in the United States, and that's true. But the TVPA is a tort statute. Congress already had on the books immigration laws and criminal laws that refuse safe haven to such people. The only purpose of the TVPA is to provide compensation. And in every tort regime of which we are aware in Federal law, and they haven't even pointed anything to the contrary in State law or in international law, the way that you get compensation in tort regimes is you hold agents liable and you hold corporations liable for the acts of their agents. It's absolutely understood. And there's no good reason, if you think of the three things that a tort statute is supposed to accomplish, compensation, deterrence and accountability, on all three of those stands, the TVPA utterly falls flat if it cannot reach organizations. And this is the perfect case that shows you how that is. Just to start with remedies, you need to be able to do that. Scalia. Maybe organizations opposed it. Maybe organizations opposed the extension of the legislation to themselves. Is that conceivable? And is Congress ever influenced by such lobbying? That may, in other cases perhaps, but you don't find anything in this legislative history suggesting that organizations were opposed. You don't find lobbying in the legislative history. Well, I can't prove something that I don't have a piece of paper for, but. It's an explanation. You say there's no possible explanation. I can imagine that corporations would have been quite upset. By this notion. Justice Scalia, one would expect to have found over the four years this was debated in the hundreds of pages of legislative history some clue that that's what Congress was reacting to and thinking about. This would be an extraordinarily unusual statute, and you'd think that one person in the Congress that voted for it or in the committee reports that are contemporaneous would mention that. The Senate report has a section called who can be sued. And what it says, I quoted it to you earlier, one would expect to find in that section that unlike every other tort statute, we're restricting the people that can be sued, but they said that. Scalia, this is the dog that did not bark, right? Legislation cannot mean what it says unless the legislative history says that it means what it says. No, Justice Scalia, I agree that if the word individual can have no other meaning than that which my opponent suggests, that I lose. But I'm suggesting to you, and we've cited plenty of authority, that there's a secondary meaning both accepted in the U.S. Code in cases and in international law. Roberts But Congress, as you've indicated, Congress focused on the very question of whether organizations would be covered or not in the context of whether a State would be covered. It seems to me that the legislative history cuts strongly against you, putting even aside Congressman Leach. The issue was there. And if they meant to say, well, let's find a term that leaves some types of organizations out, States, but not others, we'll just say individual, and people will understand. We don't mean a State, but they'll also know what we do mean, another type of organization or corporation. I think, Chief Justice, that that's exactly the thought process that Congress went through, and I can't do any better than to point to the case. Roberts But it's at least ambiguous in your saying, well, we want a term that's going to include individual persons and organizations, but not State organizations. And the only term that fits perfectly is individual. Exactly. That's our argument. Really? And page 6 to 8 of our reply brief explains why that is so. I know it might be surprising, but if you read, if you read, if you read the distance. But you've been saying all along individual has a secondary meaning. It does. So why would they have picked the secondary meaning of a word, rather than the other? Well, I think, Chief Justice, I think there's a lot more to the international law discourse than the word person, for the reason I described before. If you look at Judge Edwards' opinion. How about non-State actors? Pardon me? Non-State actors. Well, except for, remember, there's a State action requirement in the statute. Individual. Non-State actors. And organizations. I mean, maybe there's other ways that Congress could have done it. But the way that Judge Edwards did it, and the way that international law scholars and people having this conversation about whether people other than States ought to be liable under international law, with the term that they always use, and it's not just, you don't just, you know, we're not running a Westlaw search looking for wherever we can find it. They're in the titles of the articles, is whether individuals are subject to liability. Mr. Fisher, it seems to me you misrepresent our jurisprudence when you insist that individual has to have only that meaning. That's not what our jurisprudence says. We say that we give words their usual meaning, their common meaning, even though they may sometimes be used in a different fashion. It's the usual or common meaning that we apply. There's obviously cases to that effect, but I'm aware of other cases. We say it all the time. Well, I think, for example, Justice Scalia, of the jurisprudence where I had an argument in this Court about the second or successive petition rule under habeas law. And this Court has said, second, even though the word second has an obvious ordinary meaning, it doesn't actually mean that. It has a specialized usage that accumulated in the law, and when Congress used that term, we incorporate that usage. And so there is case after case where this Court has said the Morrissette principle as a backdrop against common law, where this Court has said that you do look to usage in prior opinions, prior case law, prior discourse as a way of infusing statutes with meaning. And if I could just go back to the question that I posed, which is why would Congress have done this when it just doesn't have an answer for why Congress would do this in this particular statute. Now, the other side has given a few reasons why Congress might have. Kagan Suppose we think there is no answer to that question because Congress didn't think about it, other than Congressman Leach, who appears to have thought about it and reached the opposite result. Most of them just didn't think about it, but there you are. The statute says what it says. Well, if you find the statute at least somewhat ambiguous for the reasons I've described, then what Meyer and other cases say is you assume if Congress didn't think about it that they want an ordinary tort and agency principles. In the other, in Title VII and many other cases, this Court has said, of course Congress doesn't think about all these things, and when they don't, and absent the principle of tort. Breyer Maybe they did. You see, I might as well be honest with you. Page 26 of the government's brief did have an impact on my thinking. It's Father Drinan. And Father Drinan says in the hearing, I think it would be best to stay with that and just avoid all of the problems about the PLO and related groups. And then Michael Posner testifies, it says the government, to the same effect. So there, the great advocates of this thing are sitting there saying, we don't think it should cover the PLO, let's not take that step at this time. I mean, and you have Congressman Leach, and you have the word individual. The question that Father Drinan was responding to was whether or not the TVPA ought to be extended to private entities that do not act under color of law. At the time. Breyer He's taking that. Oh, go ahead. Fisher If you look at that quote, remember that hearing was being held before the Oslo Accords, before the PLO became, in our view, a State actor. So what he's saying, if you look at the quote in context, Justice Breyer, is that the TVPA shouldn't be drawn to sweep in groups that don't act under color of law. And that issue is not before this Court today. We've argued that the PLO now does act under color of law, and that's a question for remand. That's that question. Scalia I find it hard enough to parse the statute without having to parse Father Drinan's testimony. I mean. Fisher Well, of course, I was just responding to Justice Breyer's question as to that context. But if you go even beyond compensation, for compensation you have to identify somebody, you have to bring them into a court, and you have to enforce a judgment. That's virtually impossible against only natural people. Of course Congress would have expected the ordinary rule of organizational liability. For deterrence, the Respondent's argument is, is that even if Pirate Zinc, and for this case we'll make it Torturer Zinc, were created for a policy of torturing people abroad, torturing American citizens who travel abroad, their argument is you could not hold that corporation liable, even under its express policy and purpose. There's no good reason under deterrence grounds why you'd let corporations or other organizations cycle individual actors in and out with impunity. And finally, in terms of accountability, just think about the backdrop again which with this statute was created. There are some pretty horrible groups in the world that actually claim credit and responsibility in the world stage for torturing or killing American citizens. And the idea that Congress would have passed a statute that these organizations could stand proud in their view and say, we've done this, and that our statute in the U.S. Code would somehow only get their agent and not the organizational entity itself, we submit, it just doesn't make any sense. Roberts. Well, the TVPA is an extraordinary step in terms of exposing liability. And it doesn't seem to me to be an odd idea that Congress would want to proceed carefully before establishing a situation where the use of the American tribunal is as broad as it is under this situation. Well, I don't disagree that it's an unusual statute. It's not unheard of. We've cited in our briefs many other U.S. statutes that apply extraterritorially. But remember that all the arguments for and against foreign policy friction that you heard in the first case don't apply here. Congress expressly. Breyer, the obvious thing they said is, look, just this is going to bring in suits against the Palestinian Authority. That's a very touchy issue in foreign affairs, and we don't want to have to go that far. And some of the things that are said seem to bear that out. That's what's pulling. With respect, Justice Breyer, I would just say if you look back at the legislative history, the only conversation that was had is should we reach non-State actors. That was the only conversation that was had, and that's the conversation you referred to earlier. Nobody suggested that if you applied this extraterritorially, if you enacted this statute, that you somehow ought to shirk from the ordinary rules of organizational liability. Nobody suggested that. Kagan. Kagan. Mr. Fisher, one case that you seem to have on your side, you don't have very many, but you have this one, is Clinton, which does read individual in the way that you say, and does it in order to avoid an absurd result, what the Court thought of as an absurd result. Do you think that this statute is absurd if not read your way? Fisher. I don't think — if I could beg your indulgence for one moment, I don't think I need to argue that, because I think that for all the reasons I've given, there's enough ambiguity and there's good enough reasons, like we would assume Congress meant the ordinary rule. But if I had to make that argument, I think I could, because the only arguments that have been advanced in the papers are reasons for not having this exegetorial statute in the first place. There's no good reason, once you have it, not to apply to organizational actors. And, Justice Breyer, this goes back to your comment. It's still a mystery to me how it's more problematic in international relations to hold an organization accountable to not — to hold an organization accountable than to hold its board of directors on a personal basis, or to hold, indeed, a high official of a foreign government. Nobody's made that argument. And if I could say one thing, and I'll reserve my time, take a good look at the United States' two briefs. There are — the only argument they provide in the Kiobel case is that there's no good reason, that's the United States' terms, why Congress would want to have a statute that applies only to judgment-proof individual actors and not to agents on whom they're acting on behalf of. And we think that's exactly right, and that's why Congress wouldn't have wanted that here. If I could reserve the remainder. Roberts. Thank you, counsel. Ms. Ferguson. Mr. Chief Justice, and may it please the Court. Congress enacted the Torture Victim Protection Act to create a cause of action against individuals who commit acts of torture or extrajudicial killing under color of law against other individuals. Petitioners attempt to inject ambiguity into what is a very unambiguous term in the U.S. legal usage by referring in their reply brief to a supposed subtle definition of individual in international law. But individual is not a term of art that has a specialized meaning in international law different from its ordinary meaning in U.S. legal usage. Petitioners' reply brief cites two secondary sources spanning a 60-year period, while other international law sources, including the Restatement, international conventions, and other scholars, emphasize the distinction between individuals and private organizations. Mr. Fisher ended by saying there's no reason Congress would draw this line. Why would they want to hold the individual controlling officers of an organization liable for torture, but not the organization itself? Congress was proceeding very cautiously and incrementally in enacting a statute with extraordinary territorial reach over executive branch opposition. It decided to focus on the personally responsible wrongdoers who subject victims to torture or extrajudicial killing, and it did not go beyond that to reach another class of organizations that could be held secondarily liable. But the Chief Justice's question is why did Congress do that? What were the reasons for that? Congress was focused very much on the Filartiga case, where the Second Circuit had found that there was a norm prohibiting public officials from engaging in torture or extrajudicial killing, and Congress wanted to avoid the scenario where you have a torturer who comes to our shores. And Congress agreed with the Second Circuit in Filartiga that if the torturer comes here, he should not be able to escape accountability from his victim. If his victim finds him in our country, there should be a cause of action. But Congress had every reason to proceed very cautiously and incrementally. It put its toe in the extraterritorial waters when it extended universal civil jurisdiction to violations of certain international law norms. It did not dive in. As we heard this morning in the Keogh argument, this is a very complex area as to what norms are actionable under international law. Sotomayor, I don't understand the question. How many judgments under, I don't know whether it's Filartiga or Filartiga, that that pattern where the individual torturer is found in a U.S. jurisdiction? There have been many judgments. How many have collected? Petitioners identified one case, the Jean V. de Orleans case, excuse me, where there was a collection. There may be other cases where there ultimately is a satisfaction of the judgment. But it's inherent in a statute that reaches foreign defendants that often they do not have assets in the United States. Ginsburg-McCarthy If Congress really wanted to have this, why wouldn't it include entity liability? I mean, a corporation is likely to have more money than an individual torturer. The situation Congress had in mind in enacting the TVPA was addressing the norm against State-sponsored torture and extrajudicial killing, where the agent is almost invariably acting on behalf of the State. And yet it didn't create an exception to the Foreign Sovereign Immunities Act for State-sponsors of torture and extrajudicial killing. It was concerned with this Filartiga scenario, where the U.S. wanted to take a position, we will not give torturers a safe haven in our country. Ginsburg-McCarthy What about the point that the immigration law takes care of that? They wouldn't be able to get into the country. The immigration laws were not as robust in 1991 as they perhaps are now. We know that the TVPA is premised on the fact that the torture is in fact found in the United States, because otherwise the United States couldn't assert personal jurisdiction over it. Scalia I'm not sure that the immigration officials conduct a thorough investigation. I mean, is there a box on the immigration form, you know, have you tortured people, yes, no? I really don't think they investigate that very well. Ginsburg-McCarthy It's not a perfect screen, because, of course, torturers don't announce themselves at the borders as torturers. So, in fact, that's why we have situations where we've had these gross human rights violators that end up in the United States, even in one of the cases we heard won the Florida lottery. So they do find their way to our country. Alito I still don't understand your explanation of the reason why Congress would draw a distinction between an individual and an organization. You keep saying that in the case of the individual, the individual is here, but the organization can be here, too. The organization that Congress had foremost in mind was the State. This is State-sponsored torture, State-sponsored extrajudicial killing. The problem it described regarding torture and extrajudicial killing was one of States. The legislative history talks about how one-third of the States have been engaged in sponsoring torture and extrajudicial killing. So those are the organizations they had foremost in their mind, and yet the statute doesn't impose liability on those organizations. It's addressing the very personal wrong of a torturer avoiding accountability to their victims in their home country and coming to our country and seeking safety. Sotomayor So it's okay to keep out individuals who subject others to torture, but corporations we want their money, so they should invest here? Because we're going to protect them from liability for people that they torture. I think the question is whether there was a plausible reason why Congress would have taken this incremental approach and focused first on those personally responsible versus extending liability more broadly under secondary liability theories. And because the statute is so clear on its face, because individual carries this ordinary meaning and the surrounding statutory text confirmed that Congress was using individual in its ordinary sense, Clinton presents a very high bar for the Court to depart from the plain text meaning of the statute. Scalia You don't have to prove it's an intelligent statute, do you? Maybe it's a stupid statute. Is that possible? Sotomayor It could be stupid, but it's clear. Scalia Is it possible that it's a stupid statute? Sotomayor It is possible, but it was clear enough. Breyer It's not a stupid statute. I took the reason I say that is because if you want to elaborate on this, because I purposely asked it, but one of the things in the government's brief that did, as I said, have an impact was Father Drinan is asked, shouldn't we have here — this is before it reads individual, it reads person at this time — shouldn't we have another definition for including organizations like the PLO? He responds, I think that we should exclude nongovernmental organizations. I think it would be best to stay with that and just avoid all of the problems about the PLO and related groups. Now, but you heard the response to that, which really was if I look at the context, I'll see that's less relevant than I think — than I did think. So what do you think? Sotomayor I think that even the human rights supporters who were strong advocates of getting this legislation enacted understood that this was an incremental approach, that where there was some certainty within international law was in this area of official torture carried out by public officials under color of state law, and it provided a cause of action for the Philartigas scenario. And even the human rights supporters understood that it was important to proceed cautiously and incrementally. This — the United States does not tread lightly when imposing its jurisdiction over the acts of foreign defendants for foreign conduct under color of foreign law. That's an intrusion on other nations' jurisdiction. But we don't do that lightly. Kagan Your story makes it sound as though everybody was really focused on this question and made a determination to proceed incrementally and not to include corporations. And isn't it, if you look at what happened here, more likely that other than Congressman Lynch — Leach — in fact, nobody was focused on this question, but because of Congressman Leach's intervention, the word changed and the word was continued throughout the legislative process, and that's the word that was voted on. Sotomayor Well, Representative Yatron was the sponsor of both the bill that was marked up where person was changed to individual and was also the sponsor of the bill that was ultimately enacted. So he was certainly aware that individual was selected for this reason of excluding corporations. But more importantly, individual almost invariably carries the meaning of natural person. If Congress had wanted the statute to reach non-sovereign organizations, it very easily could have used the term person, as Section 1983 does. And the notion that they couldn't use person because it would encompass foreign States is not the case when you're dealing with a person to describe a potential class of defendants, because we presume that Congress does not intend to abrogate the Foreign Sovereign Immunities Act. And the Dictionary Act tells us that person is the term Congress uses when it wants to refer to natural persons and artificial persons, but not sovereigns. So if the Congress wanted to do what the Petitioners claim, they had a very useful term that Congress uses all the time to reach that category, and it's the term person. But instead, they used individual. And elsewhere, in the same sentence, they used individual to refer to who shall be liable. They used individual four more times in a way that can only mean a human being. Now, granted, there are exceptions to this canon of consistent usage, but they have no fair application here. Those canons apply when you have a term that has more than one ordinary meaning, and you can use them interchangeably without being confusing. Here, the ordinary meaning of individual is to exclude organizations. We regularly use individuals to mean we're not talking about corporations, we're not talking about organizations. So in the same sentence of the statute, to use individual to mean, oh, it's the thing we normally mean, corporations, and then immediately to switch and use it to refer to human beings would be very confusing. And yet we see Congress very deliberately and carefully then switch to the broader term person when it wanted to sweep in a broader class of potential plaintiffs. They wanted to make sure they were sweeping as broadly as possible to allow persons who have wrongful death claims to be able to bring a suit where the victim has died. So they used the term person. And Petitioner's interpretation gives no separate meaning to individual and person, but we assume that when Congress uses those terms distinctly, they intend to give them different meanings. I would just return to the plain text of the statute. It's very clear. The only situation in which the Court has found that individual should be interpreted inconsistent with this ordinary meaning is upon a showing of absurd result. And here there simply is no absurd result. Congress had every reason to proceed cautiously and incrementally in extending U.S. jurisdiction over conduct that has no nexus to the United States, and it proceeded by focusing on the Filartigas scenario, ensuring that the U.S. would not become a safe haven for torturers. I would ask that the Court give the statute its plain text meaning and affirm the court of appeals. Roberts. Thank you, counsel. Mr. Gannon.  Mr. Gannon, suppose two people are tortured, and one is an alien who has never been within 10,000 miles of the United States. And the other is a U.S. citizen. The position of the United States is that the alien can sue, but the U.S. citizen can't? The position of the United States is that the alien may be able to sue, and I think that that's going to depend ultimately on this Court's construction of the ATS. There are always going to be differences in application between the ATS and the TVPA so long as the ATS is still on the books and has any vitality. That, of course, wasn't clear to Congress when it enacted the TVPA in 1992. It wasn't sure whether the ATS was going to be a going concern in light of Judge Fork's opinion in Tell-O-Ren. But rather than amend the ATS, Congress in the TVPA decided to create a separate statute which provided an express right of action both to aliens and to U.S. citizens for two specific norms. It's broader than the ATS in several ways, but it's narrower than the ATS in several ways. So if your hypothetical involved piracy, two victims of piracy, then it's quite clear after this Court's decision itself. But two victims of torture, you don't find that to be an incongruous result? Well, I think that is ultimately going to depend upon what happens under this Court's ATS jurisprudence. And so it does seem that the Court's position of the United States in the other case today is that the ATS does not include a categorical bar on corporate liability and that has no regard for the theory of liability, the locus of the acts, the citizenship of the parties, and the character of the international law norm. I suppose Mr. Rahim had never been naturalized. I guess that was a mistake. Well, in this instance, then that would present a different question that this Court has not yet been presented with under the ATS. And ultimately, maybe an alien will be able to bring a suit under the ATS that he can't bring, that a U.S. citizen could not bring under the TVPA. But that is a product of the fact that there are still two different statutes. The Alien Tort Statute will always give more rights to aliens than to U.S. citizens because by definition it is only available to aliens. So what's the good reason for the U.S. to have limited liability to natural persons in the TVPA, but not in the ATS context? Well, I think that there are several reasons that Congress could have had in mind, although I think that if you read the legislative record, that Justice Kagan is probably correct that most members of Congress weren't thinking precisely about this question. Representative Leach appears to have been. And I think that in the other passage cited on page 25 of the United States brief involving Father Drinan that Justice Breyer was looking at before, there's an earlier passage that we cite where Father Drinan seems to indicate that there may be a distinction between the two bills that are pending before the Senate at that point, because one refers to persons and one refers to individuals. But they were thinking about that in 1797? I mean, you're saying in the later statute they didn't. No. I think that in as this is. Much more perceptive Congress in 1797. No. I think the difference is that the ATS has not even attempted to speak to this question, whereas the TVPA does. As this Court noted in Amarada Hess, the ATS does not define a class of defendants. Here, Congress did define a class of defendants. And I think that there are several reasons why they ended up with this result, the chief of which is that all of the cases that they were thinking about at that time had involved natural persons. The Phil Artiga case was the flagship. Breyer, that's why they're thinking of it. His argument the other way, which I see now, is that, is that, look, Father Drinan and the others are not talking about individual versus person. They're talking about whether, say, the PLO falls under color of law of a foreign State. And so they're not thinking of that question. And if in fact it does fall under color of law there, they don't care about whether it's individual or person. They've never really thought about that. And in fact, the only one who thought about it was Congressman Leach. And that was four bills earlier. But the reason that they're not thinking about it is because the paradigm that they were thinking about was the torturer who is found in the United States, who is walking on the streets. There's an individual moral accountability that everybody understood needed to happen there. To the extent that the legislative history is referring to groups, my friend Mr. Fisher referred to references in the legislative history to groups and organizations. They basically are references to things like death squads. And as a practical matter, even today, none of the cases in the Eleventh Circuit that are being brought under the TVPA are being brought against death squads. They — the case that Petitioner cited in their reply brief, the Drummond case, was not a case where the Colombian paramilitary was a defendant. The defendants there were actually two corporations and a CEO. And so I think as a — as a practical matter, although it is natural for us to think that if an individual is liable, then so, too, is the — is the organization that it may have been acting — he may have been acting on behalf of. But it is not natural to think that these type of clandestine, shadowy organizations that would claim responsibility for such acts, such heinous acts overseas, would have a jurisdictional presence in the United States. And I think if you — as Respondents' counsel already noted, the — because the TVPA requires State action, the organizational entity here is usually going to be the State. But Petitioners acknowledge that no State entity is going to be liable here. And, indeed, the result here is not that dissimilar to some of this Court's 1983 jurisprudence. Petitioners mentioned the question of whether Congress was concerned that the term person might pull in something like municipalities because it could be read to bring in sovereigns. But in — in the context of municipalities under Monell, this Court has concluded that there is no respondeat superior liability and that superiors are — supervisors are not liable for the torts of their agents. They are only liable for their own individual wrongs. And so I do think that there are policy reasons why Congress could have said something different here. But — and they may well be encouraged to do that by 20 years of ATS precedent that has now, for the first time since the TVPA was enacted, started to raise the question of whether corporations should be held liable under the other statute. If Congress wants to disagree with the types of policy concerns that were behind this Court's Monell decision, Congress could reach a different result. But we don't — we don't think that that's a decision that ought to be reached through statutory construction. Here, Congress used the term individual. It spoke about an individual who subjects an individual to torture or extrajudicial killing. It separately referred to person. And Petitioner's reading of the — of the statute actually gets the relationship between person and individual, which is quite clear as an ordinary question of Federal statutory construction in the Dictionary Act, precisely backwards, because under their reading, individual means any non-sovereign natural or artificial person, but person can mean only natural person. And so we think that that is — is a particularly odd reading of the statute in light of the Dictionary Act and the statutory structure. If there are no further questions, I'd urge the Court to affirm. Roberts. Thank you, Mr. Gannon. Mr. Fisher, you have four minutes remaining. I'd like to make four points, if I may, Your Honor. First, when asked again and again why Congress would have done this, I think all I heard was that Congress wanted to adopt an incremental approach, and then Mr. Gannon said, well, maybe we also wanted to have moral accountability. Well, an incremental approach doesn't make any sense. Yes, Congress did so in the context of requiring exhaustion and a limitations period, and so it treaded softly there. But there are numerous Federal statutes, RICO, the Sherman Act, the Antiterrorism Act, which is quite similar to this Act in many ways, that apply to events abroad, and they all apply to organizations. So if Congress was going to do this, there's no reason to think it wouldn't have wanted to do it. Ms. Ferguson pointed to the Doralene case as the one example she could point of where a TVPA judgment was able to be enforced. And the only reason why that was able to be enforced is because that guy happened to win the Florida lottery. He had hidden all of his other assets abroad and won the Florida lottery. And is that the statute that Congress meant to pass? We don't think so. Moral accountability was already taken care of in the U.S. Criminal Code. There's an express provision of the U.S. Criminal Code that holds torturers liable for torturing abroad, and we've cited that in our briefs. I know some of you are going to look at the legislative history, so let me say two quick things about the legislative history. First, Justice Kagan, with respect to Representative Leach's comment, if anyone after that hearing wanted to know what that committee thought the change it had made meant and what the bill meant, it would have looked at its report. And if we cited the committee report from the Foreign Relations Committee, and it says the TVPA allows liability for any person that commits torture. It uses the word person utterly interchangeably with the word individual. So that whatever moment happened four years before the enactment was long since lost. And the reason it used ultimately the word individual and that person, as I've described before, was to steer clear, I think, of any possibility of State entities. Mr. Gannon points to Monell, but Monell favors us. Monell holds that organizations can be liable. Now, there's a separate question that you talked about in the earlier argument, too, as to what the mens rea would be, whether it would have to be according to a policy or practice or whether it would be pure respondeat superior. But Monell is on our side in this case, and we've alleged a policy in our complaint in this case. Thirdly, in the U.S. Code where the word individual is used, it obviously means natural persons lots of times. But when it does, it almost always uses the — contrasts it in that very sentence with an entity or organization. And so in discourse, when you say individuals or corporations, yes, you mean a natural person, but it's as the United States points out in footnote 3 of its own brief, the word individual, when it's used alone, is a less favored usage that actually gives rise to ambiguity because of the secondary meaning I've described before. And then finally, let me say the questions were asked about the relationship between this case and the Kiobel case. And I think it's absolutely clear, and this goes again to one of Justice Kagan's questions on absurdity. If this Court holds that the Alien Tort Statute would have let a torturer, right by Mr. Rahim, someone who's tortured, that is, bring a cause of action, I think it would indeed be absurd to imagine Congress stepping in and passing a statute saying, if you're an American citizen, I'm sorry, you're out of luck. But if you happen to be lucky enough to be an alien and never having tried to be a citizen in this country, go ahead and bring a case in our courts. We think that would be absurd. So with those points, if the Court has any further questions on the submissions I've made, I guess the last thing I would say is at the end of Mr. Gannon's argument, he referred to the interplay between the word individual and person in the briefs. And I can assure you from having worked on this during the case, it is an incredible sideshow as to whether or not Estates are people and all the way that that works. But it's laid out in our brief, and we think that it's quite clear that there is no disjoint between the word individual and person. If you look at our briefs, it will explain why. Roberts. Thank you, counsel. Counsel, the case is submitted.